**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CLARENCE MACK PRUITT,**

     **Plaintiff,**

**vs.**                                  **CIVIL ACTION NO. 3:19-CV-00383**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

     This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered May 17, 2019 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 9, 10)

     Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 9), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 10); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Clarence Mack Pruitt (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on September 22, 2015 alleging that his disability began on September 25, 2014 because of a "severely damaged knee", "upper spinal damage", "torn rotator cuff", and "finger locked."[1] (Tr. at 166, 203) His claim was initially denied on December 28, 2015 (Tr. at 95-99) and again upon reconsideration on June 13, 2016. (Tr. at 103-109) Thereafter, Claimant filed a written request for hearing on July 20, 2016. (Tr. at 110-111)

An administrative hearing was held on February 23, 2018 before the Honorable Francine Serafin, Administrative Law Judge ("ALJ"). (Tr. at 35-68) On March 22, 2018, the ALJ entered a partially favorable decision. (Tr. at 13-34) On April 17, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 164-165) The ALJ's decision became the final decision of the Commissioner on March 27, 2019 when the Appeals Council denied Claimant's Request. (Tr. at 1-6)

On May 15, 2019, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant, (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 6, 7) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 9), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 10), to which Claimant filed his Reply Brief (ECF No. 12). Consequently, this matter is fully briefed and ready for resolution.

---

[1] Claimant alleged that he stopped working on August 24, 2015 as a result of his conditions. (Tr. at 203) According to the human resources records from his former employer, Toyota Motor Manufacturing, West Virginia, Inc., Claimant's "last day physically working is August 18, 2015", thereafter, Claimant received short-term disability benefits. (Tr. at 198)

**Claimant's Background**

Claimant was 52 years old as of the alleged onset date and considered a "person closely approaching advanced age", but by the time of the ALJ's partially favorable decision, Claimant had changed age categories and would be considered a "person of advanced age." See 20 C.F.R. § 404.1563(d), (e). (Tr. at 27) Claimant obtained a GED. (Tr. at 204) He previously worked as a heavy equipment operator in the coal industry and later as a team leader at a Toyota car manufacturing plant. (Id.) Claimant used to lift heavy weights for bodybuilding as a hobby. (Tr. at 44-46)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2021. (Tr. at 19, Finding No. 1) At the first inquiry, the ALJ determined that Claimant engaged in substantial gainful activity ("SGA") from February 6, 2015 through August 18, 2015, however, Claimant did not engage in SGA during the remaining periods since the alleged onset date of September 25, 2014. (Tr. at 19-20, Finding Nos. 2, 3) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: osteoarthritis of the right knee; lumbago; hernia; and right locked finger joint. (Tr. at 20, Finding No. 4)

At the third inquiry, the ALJ concluded that since the alleged onset date, Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 21, Finding No. 5) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

4

except he can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds, kneel, and crawl. The claimant can occasionally balance and crouch. The claimant can frequently stoop. He can occasionally reach overhead with the bilateral upper extremity. The claimant's bilateral overhead lifting is limited to 25 pounds frequently.

(Tr. at 22, Finding No. 6)

At step four, the ALJ found Claimant was not capable of performing past relevant work. (Tr. at 27, Finding No. 7) At the final step, the ALJ determined that prior to December 11, 2017[2], in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there are jobs that exist in significant numbers in the national economy that Claimant can perform. (Tr. at 27, Finding Nos. 8-11) However, the ALJ found that beginning on December 11, 2017, Claimant was disabled, but not prior to that date. (Tr. at 27-28, Finding Nos. 12, 13)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant contends that the ALJ committed reversible error when she failed to provide good reasons for rejecting the opinion of his treating sources, John Neville, Jr., M.D. and David Watkins, PA-C, which in turn resulted in an improper RFC assessment. (ECF No. 9 at 11) Claimant points out that his treating sources' opinion was well-supported by the medically accepted clinical and laboratory diagnostic techniques as prescribed by the Regulations and should have been given controlling weight. (<u>Id</u>. at 11-12) Both the objective medical evidence and other evidence of record show that Claimant's right knee was severely impaired which impacted his abilities to stand or walk, and is consistent with his treating providers' opinion that Claimant could sit, stand, and walk less than two hours in an eight hour workday. (<u>Id</u>. at 12-15) This would have precluded him from

---

[2] The ALJ had determined that in addition to the change of age categories, "additional adversities" occurring on December 11, 2017 rendered Claimant disabled pursuant to Medical-Vocational Rule 202.06. (<u>See</u> Tr. at 27, 28)

even light exertional work, because that involves a good deal of walking or standing per the Regulations, and further, would have resulted in a fully favorable decision for Claimant pursuant to the Grids framework. (Id. at 12, n. 1)

Claimant asks for this Court to reverse the final decision and to award him benefits, or for remand to correct these errors. (Id. at 16)

In response, the Commissioner argues that the ALJ properly evaluated the treating source opinion because it conflicted with the medical and other evidence of record, including with the sources' own treatment notes. (ECF No. 10 at 14) Further substantial evidence supports the ALJ's evaluation of this opinion because the record shows that treatment for his right knee had been generally routine and conservative throughout the relevant period. (Id. at 15) The Commissioner points out that Claimant was considered a surgical candidate for his right knee issues in August 2014, however, Claimant returned to work in February 2015 and continued to work through September 2015. (Id., n. 4) Further, Claimant's admitted daily activities during the relevant period was inconsistent with Dr. Neville's and Mr. Watkins' assessment of his capabilities and did not support a finding of permanent disability. (Id. at 16) Even though the State agency physicians determined that Claimant was capable of medium-level work, the ALJ gave Claimant the benefit of the doubt and restricted Claimant to light work, further demonstrating substantial evidence supports the ALJ's assessment of the opinion provided by Dr. Neville and Mr. Watkins. (Id. at 16-17) The Commissioner contends that Claimant appears to ask this Court to re-weigh the conflicting evidence, which the Fourth Circuit has forbidden. (Id. at 17)

Because substantial evidence supports the final decision, the Commissioner asks this Court to affirm. (Id. at 17-18)

In reply, Claimant points out that the evidence cited by the Commissioner that demonstrated Claimant exhibited a normal gait with normal muscle tone and strength, etc. also demonstrated that Claimant's right knee was tender where pain and crepitus were present on motion. (ECF No. 12 at 1-2) Further, although Claimant had conservative treatment during the relevant period, it is important to recognize that Dr. Farrow at the Cleveland Clinic warned Claimant that surgery was not advisable, therefore, only conservative orthopedic treatment was available for his right knee condition. (Id. at 2) The Commissioner provides no explanation for how the ALJ reconciled the evidence with his findings when the medical evidence showed that Claimant's right knee showed severe osteoarthritis and that the consultative examiner noted that he walked with a limp and described the right knee as loose and lax. (Id.)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Right Knee Treatment:

Claimant first sought treatment for his right knee on October 29, 2010 due to pain and swelling that had persisted for one day. (Tr. at 342) An x-ray revealed moderate sized joint effusion with no evidence of acute fracture. (Id.) Claimant has seen David Watkins, PA-C, for primary care since at least September 4, 2013. (Tr. a 460) Treatment notes show that Claimant's medical history consisted of thoracic spine pain, hypotestosteronism, hypothyroidism, joint pain, and right knee pain. (Id.) Mr. Watkins observed crepitus and pain with motion of the right knee; Claimant was also prescribed a back brace for his complaints of back pain. (Tr. at 462) Mr. Watkins referred

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Claimant for an orthopedic evaluation of his right knee in November 2013, as it was noted to be tender with edema present and decreased stability on maneuvers. (Tr. at 463)

On January 6, 2014, Claimant saw George Muschler, M.D. at the Cleveland Clinic for an orthopedic evaluation of his right knee pain. (Tr. at 354-358). Claimant reported that his knee pain began in 2011 after he was involved in a motorcycle accident during which he suffered a right patella fracture. (Tr. a 354) He stated that his knee was weak compared to before the injury and surgery, and as such, he was unable to do his usual running and weight-lifting routines. (Id.) On examination, Claimant walked independently but with a limp. (Tr. a 355) He had normal stability in his right knee, but moderate effusion, slightly decreased quadriceps strength, and slightly decreased range of motion. (Id.) The remainder of Dr. Muschler's examination, including examination of the spine, hips, feet, ankles, upper extremities, head, neck, skin, and neurovascular systems, was grossly normal. (Id.) Dr. Muschler also noted that Claimant had a well-developed muscular physique consistent with an active workout history. (Id.) In addition, an x-ray of Claimant's right knee revealed abnormal appearance of the patellar tendon. (Tr. a 360-361) An ultrasound of the right knee revealed proximal and mid patellar tendon thickening and mixed echogenicity, possibly related to postoperative change or tendinosis with no distinct tendon tear. (Tr. at 359) Dr. Muschler assessed Claimant with right quadriceps tendon incompetence and patella deformity with patellofemoral arthritis. (Tr. at 353) He recommended a right quadriceps tendon reconstruction. (Id.)

Later, on January 15, 2014, Claimant returned to Mr. Watkins, who observed the right knee had crepitus and pain with range of motion. (Tr. at 471) Claimant reported that he was unsure he could financially afford the time off to have the procedure done at the Cleveland Clinic. (Tr. at

8

469)

Claimant returned to Mr. Watkins in March 2014 complaining of increased right knee pain secondary to a recent fall. (Tr. at 473) He stated his knee pain was not relieved from Norco or prednisone and that he was having difficulty making contact with Cleveland Clinic Ortho. (Id.) A physical examination of Claimant's right knee showed moderate range of motion restriction, tenderness to palpation, edema, and crepitus, but normal stability. (Tr. at 475) Examination of Claimant's upper extremities and left knee revealed normal range of motion, no tenderness to palpation, no joint instability, and no joint crepitus. (Tr. a 474-475) Mr. Watkins assessed Claimant with right knee pain, prescribed Percocet and Norco, and referred him to an orthopedist. (Tr. at 475) Claimant was advised to avoid climbing, kneeling, crawling and lifting more than 15 pounds. (Tr. at 481)

Claimant saw Mr. Watkins for follow up appointments in April, June, and August 2014, but his physical examinations were unchanged. (Tr. at 484, 487-488, 490-491, 493-494) On August 8, 2014, Claimant sought treatment for exacerbation of his right knee pain again following a recent fall; he was given an injection. (Tr. at 489, 491) In a treatment record dated August 15, 2014, it was noted that Claimant was on FMLA leave from his job at Toyota and that he had an appointment at Cleveland Clinic on August 2[5], 2014. (Tr. at 492)

On August 25, 2014, Claimant saw Lutul Farrow, M.D. at the Cleveland Clinic for a second orthopedic evaluation of his right knee. (Tr. at 348) Dr. Farrow noted that Claimant's right patella fracture was the result of having been hit with a ballpeen hammer three years prior and reported Claimant's symptoms as swelling, popping/clicking, locking, giving way, night pain and pain with stairs and squatting. (Id.) Dr. Farrow noted that Claimant was a well-appearing, well-nourished

individual in no acute distress with a muscular build. (Id.)  Claimant had significant patellofemoral crepitance, pain along both facets, moderate quadriceps atrophy, a 5-degree extensor lag, and some patellofemoral compression, but he had normal gait, no effusion, and intact sensation. (Id.) He also had normal stability, strength, and range of motion in his left knee and right hip. (Id.) Dr. Farrow sent Claimant for a right knee MRI, which showed complex tears of the posterior horn of the medal meniscus; complex thickening and edematous changes in the proximal patellar tendon with postsurgical changes; a small joint effusion; and cartilage loss and degenerative changes in the medial joint space. (Tr. at 344-345) Dr. Farrow subsequently determined that Claimant was a candidate for a patellar tendon reconstruction, but recommended that Claimant not proceed with the procedure due to possible difficulty recovering secondary to patellofemoral arthritis. (Tr. at 348)

On September 19, 2014, Claimant returned to Mr. Watkins and complained that Percocet no longer provided relief for knee pain and that he was experiencing increased frequency of falling and instability. (Tr. at 495) Claimant described his right knee pain as moderate on October 1, 2014 and was diagnosed with internal derangement of the knee. (Tr. at 499) He and Mr. Watkins discussed the option of filing for disability. (Tr. at 501) October 17, 2014 records show continued reduced range of motion and pain in his right knee with decreased stability. (Tr. at 504) On November 14, 2014, Claimant continued to complain of knee pain and was prescribed Prednisone. (Tr. at 511) By February 4, 2015, Claimant completed physical therapy on his right knee. (Tr. at 516) On February 23, 2015, Claimant was restarted on Norco for knee pain. (Tr. at 521)

Claimant was on short-term disability from September 29, 2014, through February 5, 2015 (Tr. at 196) Records from Cigna Group Insurance confirm that Claimant was on medical leave during this period, but they do not contain any specific physical functional limitations that

prevented Claimant from working. (Tr. at 182-194). He returned to work in February 2015, where he continued to work on a full-time basis until August 2015, when he injured his shoulder. (Tr. at 196)

On January 21, 2016, Claimant returned to Mr. Watkins and continued to complain of right knee pain and also left rhomboid pain on January 21, 2016; he explained that the pain began following an injury three days prior and reported a fall in his garage. (Tr. at 553) On February 24, 2016, Claimant presented with right knee pain, following an injury three days previously having fallen down stairs at home where the knee bucked anteriorly. (Tr. at 557) He was diagnosed with a quadricep muscle strain and prescribed anti-inflammatories. (Tr. at 559) On March 31, 2016, Claimant reinjured his right knee from the prior week while working out in the yard; Claimant reported that his knee gave out walking down a slope. (Tr. at 750) He reported that Percocet reduces his pain levels from 8/10 to 5/10 and if he watches his activity, it helps more. (Id.) He reported having quit work and applied for disability; he reported able to perform activities of daily living at home. (Id.) On June 30, 2016, Claimant returned to Mr. Watkins complaining of right knee pain that was moderate and throbbing that began five days previously from a squatting exercise. (Tr. at 758) He stated that exercise aggravates the pain. (Id.) Records dated December 1, 2016 indicate that Claimant continued to report instability, swelling and right knee pain. (Tr. at 772) He was provided a knee brace and advised to follow-up at the Cleveland Clinic if it got worse. (Tr. at 775)

On February 13, 2017, Claimant returned to Mr. Watkins for lumbar pain radiating into his left leg. (Tr. at 782) A straight leg raise test was positive at 30 degrees and tenderness was noted in the sacral region. (Tr. at 784) He was able to walk without difficulty. (Id.) He was diagnosed

11

with acute left sided low back pain with left sided sciatic and lumbago with sciatica on the left side. (Id.) Gabapentin 300mg and Medrol was prescribed with instructions to avoid heavy lifting. (Id.) On February 27, 2017, Claimant was prescribed a rigid right stability knee brace. (Tr. at 674) His knee pain was noted to interfere with rehabilitation effectiveness and his instability and pain were progressing. (Tr. at 675) His sciatica pain was noted to improve. (Tr. at 679) Crepitus and pain with motion continued in his right knee, though range of motion was normal. (Tr. at 681) Percocet was prescribed for pain. (Tr. at 682)

Records dated May 23, 2017 indicate that Claimant returned to Dr. Neville for a follow-up appointment and reported falling on the stairs at home. (Tr. at 789) He lacked full extension and flexion in the right knee and also has patella crepitus present. (Tr. at 791) He was prescribed Naprosyn 500 mg. (Tr. at 792)

An x-ray of Claimant's right knee dated July 18, 2017 showed redemonstration of fragmentation and/or ossification of the inferior patella and infrapatellar tendon that remained unchanged from previous examination. (Tr. at 793) Medial knee joint compartment narrowing and spurring compatible with degenerative joint disease was noted with no abnormality in bone architecture or alignment. (Tr. at 739)

During a follow up visit with Mr. Watkins on August 28, 2017, Claimant reported that his knee pain was exacerbated by activity, such as mowing. (Tr. at 797) Right knee tenderness and crepitus were present, and his stability was decreased. (Tr. at 799)

Treatment for Right Shoulder:

On August 4, 2015, Claimant complained of right shoulder pain that began gradually two months prior. (Tr. at 530) At a follow-up appointment on August 24, 2015, Claimant reported that

his right shoulder pain was exacerbated two weeks previously from a fall on vacation and he had been unable to go to the gym for the last 2 weeks. (Tr. at 533) He received an injection on August 26, 2015 (Tr. at 536) and an MRI taken on September 1, 2015 revealed a near full-thickness articular sided tear with mild to moderate acromioclavicular joint arthritis. (Tr. at 563) He was diagnosed with a rotator cuff injury to the right shoulder on September 4, 2015. (Tr. at 541) Claimant then underwent right shoulder arthroscopy with arthroscopic rotator cuff repair and arthroscopic acromioplasty and bursectomy on September 30, 2015. (Tr. at 373) Claimant tolerated the procedure well and during an orthopedic follow-up appointment on March 29, 2016, he reported improvement with his shoulder and demonstrated only slight restriction on range of motion. (Tr. a 610-611) Claimant testified that his shoulder is close to 100 percent since the surgery. (Tr. a 47)

    <u>Records Related to Hernia Impairment:</u>

    Although Claimant's shoulder improved, he unfortunately developed a hernia post-operatively. He presented to the hospital on October 14, 2015, with complaints of pain in his left upper quadrant of the abdomen and lower chest. (Tr. at 402) Claimant had supraventricular tachycardia, which resolved after cardioversion. (<u>Id</u>.) He also had some spells of upper body shaking with alteration of consciousness or bouts of confusion, but his EEG was normal. (Tr. at 402, 411-412) However, a CT scan of the chest, abdomen, and pelvis revealed a large hiatal hernia. (Tr. at 402, 436) In light of this finding, Claimant underwent exploratory laparotomy with hiatal hernia repair. (Tr. at 405-407) Physicians discharged him in stable condition on October 19, 2015. (Tr. at 402-404)

    At a follow up appointment with Mr. Watkins in June 2016, Mr. Watkins noted that

Claimant's left midline incisional hernia was reducible and non-tender. (Tr. at 756) Mr. Watkins advised Claimant that it was "okay" for him to lift. (Id.) Claimant presented to the emergency room on January 11, 2017, complaining of right sided abdominal pain. (Tr. at 735) However, Claimant's abdominal examination was benign, and a CT scan of the abdomen and pelvis showed significant decrease in the size of his hiatal hernia status post-surgery. (Tr. at 736-737) Indeed, Claimant had only a small residual hiatal hernia present with no bowel distention or obstruction; no free fluid or pneumoperitoneum; and no acute osseous abnormality. (Tr. at 737) Physicians discharged him the same day in stable condition. (Tr. at 730)

On February 27, 2017, Mr. Watkins noted that Claimant had no tenderness of the abdomen. (Tr. at 681) Claimant returned to Mr. Watkins on August 1, 2017, with a complaint of a bulge in his incision site present for two weeks. (Tr. at 794) Mr. Watkins stated that the bulge was intermittent and reducible. (Id.) Mr. Watkins referred Claimant for a CT scan of the abdomen on August 30, 2017, which showed impressions of hiatal hernia, fatty liver, cholelithiasis, and nephrolithiasis without hydronephrosis. (Tr. at 801) During an emergency room visit on October 12, 2017, Claimant had findings of hiatal hernia, but physicians advised that his pain complaint was due to spasm of the gallbladder. (Tr. at 744-745) Notably, Claimant acknowledged that he was scheduled for gallbladder surgery in November due to a history of gallstones. (Tr. at 743)

Records Related to Right Ring Finger Impairment:

In November 2014, Claimant saw Jacquelin Mollohan, FNP-BC, for evaluation of his right ring finger for symptoms associated with a dislocation after a September 2011 fall. (Tr. a 367) On examination, Claimant had a flexure contracture of the PIP joint on his right ring finger, but he could make a full complete fist and had full range of motion of all other digits. (Id.) Ms. Mollohan

assessed Claimant with flexure contracture of the right ring finger and referred him to a physical therapist for splinting. (Id.)

Records Related to Lumbago Impairment:

Since Claimant returned to work in February 2015, treatment for his musculoskeletal impairments has been limited to follow up appointments with Mr. Watkins, his primary medical provider. (Tr. at 520-559, 750-766, 772-774, 782-792, 794-800, 804-815) In March 2015, Claimant complained of midline upper back pain. (Tr. at 524) However, his physical examination was unremarkable showing thoracic tenderness, but no joint instability, no joint or limb tenderness, normal range of motion throughout, no joint crepitus, normal muscle tone, bulk, and strength, intact sensation, no neurological deficits, and normal gait. (Tr. at 526) In August 2015, Claimant complained of shoulder pain, but examination of his pelvis, spine, left upper extremity, and lower extremities was normal. (Tr. at 531-532). Claimant did not complain of back or knee pain again in 2015. (Tr. at 533-552) There is no evidence that Claimant was seen by an orthopedist, pain management physician, spine specialist or physical therapist since February 2015.

Consultative Internal Medical Examination:

At the behest of the state agency, Claimant saw Kip Beard, M.D., for a consultative examination on December 8, 2015. (Tr. at 452-457) At that time, Claimant alleged an inability to work due to a knee injury, spinal damage, rotator cuff injury, and a locked finger. (Tr. at 452)

With regard to Claimant's right knee, Dr. Beard observed that he limped on the right with some varus alignment of the right knee, but he had no need for a handheld assistive device. (Tr. at 454) Dr. Beard observed that Claimant's gait was not unsteady or unpredictable, and he could stand unassisted. (Id.) Dr. Beard found Claimant's right knee revealed evidence of deficit over the

medial aspect of the patella, which he noted to be "rather loose or lax" and that Claimant had moderate pain with tenderness and crepitus; a normal examination of the left knee. (Tr. at 455) Dr. Beard also observed that Claimant could heel walk, toe walk, and tandem walk, but could not fully squat with pain. (Id.) An x-ray of the right knee revealed an abnormally elevated patella with abnormal morphology of the patella and sub patellar calcifications. (Tr. at 457) "The pattern suggests prior patellar tendon rupture and or concomitant patella fracture which had healed with secondary patellofemoral osteoarthritis, advanced." (Id.) Milder femorotibial right knee osteoarthritis was also noted. (Id.)

As to Claimant's locked finger, Dr. Beard noted that he was able to button and pick up coins with either hand and write with his dominant hand without difficulty. (Tr. a 455) Dr. Beard also indicated that Claimant had no pain, tenderness, redness, warmth or swelling; atrophy; or Heberden's or Bouchard's nodes. (Id.) Claimant's right fourth PIP joint was at a 90-degree flexion deformity with no active range of motion, but otherwise his range of motion of the finger was normal. (Id.)

Regarding Claimant's hernia, Dr. Beard noted that Claimant had a mildly tender abdomen with no guarding, rebound, or rigidity, and he stated that Claimant was well healed without herniation. (Tr. at 454)

Finally, with regard to Claimant's spine, Dr. Beard stated that Claimant had only mild discomfort on motion testing of the lumbar spine with tenderness, but no spasm. (Tr. at 455) Claimant's seated straight leg raise was 90 degrees bilaterally and supine 70 degrees with back discomfort. (Id.) Dr. Beard concluded by noting that Claimant had no neurologic compromise related to his spine. (Tr. a 455-456)

Dr. Beard's diagnoses included, among other things, right patellar fracture, status post open reduction and internal fixation with residual deformity and possible posttraumatic arthrosis; right 4th finger flexion deformity; osteoarthritis; chronic cervical and thoracic strain; and strangulated hiatal hernia, status post-surgical repair with postsurgical abdominal soreness. (Tr. at 456)

State Agency Medical Opinion:

On December 24, 2015, Narenda Parikshak, M.D., reviewed the evidence of record at the initial level of review and concluded that Claimant could perform a reduced range of medium work where he could stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and with only occasional crawling, crouching, kneeling, balancing, and climbing of ramps/stairs, ladders, ropes, or scaffolds; frequent stooping; lifting no more than 25 pounds overhead; and the need to avoid concentrated exposure to extreme cold, wetness, humidity, pulmonary irritants, and work hazards. (Tr. at 76-78)

On June 10, 2016, at the reconsideration level of review, Rogelio Lim, M.D., reviewed the updated record and affirmed Dr. Parikshak's physical RFC assessment. (Tr. at 90-92)

Treating Source Medical Opinion:

On November 28, 2017, John W. Neville, M.D., and David Watkins, PA-C, completed an RFC questionnaire in support of Claimant's claim for disability benefits. (Tr. at 688-690) Dr. Neville and Mr. Watkins noted that they had been treating Claimant since May 2012 and rated his pain on an average day as a 7 out of 10 which constantly interferes with his attention and concentration. (Tr. at 688) They opined that Claimant's pain would produce both "good days" and "bad days". (Tr. at 689) They estimated that Claimant could continuously sit for one hour, stand for 15 minutes, and walk for ten minutes at one time; they opined that Claimant could only sit,

stand, and walk less than 2 hours during an 8-hour workday. (Id.) Further, they noted that Claimant needed a job that permitted him to shift positions at will, and that he would need to take unscheduled breaks every hour. (Id.) Dr. Neville and Mr. Watkins further opined that in a competitive work situation, Claimant could occasionally lift upto ten pounds; he frequently needed to sit and elevate his knee above waist level to reduce pain and swelling; and he had significant reaching, handling, and fingering limitations due to low back pain and his right 4th finger tendon damage. (Tr. at 689-690) Finally, Dr. Neville and Mr. Watkins estimated that Claimant would likely be absent more than four times per month and his impairments would cause him to be off-task more than 20% of the workday. (Tr. at 690

**The Administrative Hearing**

Claimant Testimony:

Claimant confirmed that he previously lifted significant weights prior to his alleged disability, where at one point it was 540 pounds. (Tr. at 44) However, since he started having problems with his shoulder and with his knee, he was not benching the way he had before, and he was no longer running or walking on the treadmill. (Tr. at 45) He admitted that in the last couple of years that he did "light curls", but no significant benching or leg work; Claimant explained that "light curls" meant 20 or 15 pounds. (Tr. at 45-46)

Claimant testified that the main issue for him is his knee, which causes him pain that he rated at a "3" on a normal basis, but when he goes shopping with his wife at Walmart, he is unable to stay the entire time because his knee pain reaches a 8 or 9 and he returns to the car. (Tr. at 47-48) He mostly sits at home with an ice pack on his knee most of the day. (Tr. at 48) Claimant testified that his knee gives out "pretty common" without warning, such as when walking down

steps, so he has to go down sideways. (Id.) It has even given out once or twice getting out of the shower. (Id.) He confirmed that he has fallen in his garage because of his knee as well. (Id.) As for further treatment for his knee, Claimant testified that providers at the Cleveland Clinic advised that it was beyond repair. (Tr. at 57)

Regarding other daily activities, Claimant testified that he will wash a load of clothes, sometimes cook something in the microwave, but he does very little yard work and has his son help with that. (Tr. at 48-49) In August 2015, Claimant went on vacation to Cancun, but he mostly stayed in the room. (Tr. at 49, 51)

As for his hernia repair, Claimant testified that he has a hiatal hernia again and that he wears a brace for it; he is scheduled to have gallstones removed as well. (Tr. at 50) Claimant was told that his years of heavy lifting caused his hernia and that he was advised not to even carry groceries in the house. (Id.) Claimant advised that the hernia started up again when he returned from Cancun. (Id.) When he first had his hernia issue, Claimant testified that he went to the hospital after four days of laying down in the bathroom and had a heart attack. (Tr. at 51) He received surgery and was told that he experienced seizures due to the pain from the hernia going into his chest. (Tr. at 52)

Claimant demonstrated that he cannot straighten his right ring finger and that it causes him problems with holding and gripping things. (Tr. at 53)

Claimant used to enjoy riding motorcycles but no longer does this activity because of pain, and he can't put his leg down because it will buckle, so he can't ride. (Tr. at 55) Going to the gym was a big outlet for Claimant, but he has not been able to do that as he had previously. (Id.)

Claimant testified that he won't use a cane or walking device even though it was recommended that he should because it is embarrassing for him. (Tr. at 57)

Diana Sims, Vocational Expert ("VE") Testimony:

When asked about a hypothetical individual with Claimant's age, education and work history and limited to light exertional work who can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; frequently stoop; never kneel; occasionally crouch; never crawl; occasional overhead reaching bilaterally; and bilateral overhead lifting is limited to 25 pounds frequently, the VE testified that such an individual could perform the jobs of a final inspector, final assembler, and a sorter/inspector. (Tr. at 63-65) The VE further testified that there would be no jobs for the hypothetical individual at the sedentary level with those limitations. (Tr. at 65-66)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4ᵗʰ Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

Evaluation of Opinion Evidence:

Because Claimant takes issue with the ALJ's evaluation of his treating sources' opinion evidence, as a practical matter it is best to review how the SSA governs the criteria for evaluating opinion evidence prior to addressing the ALJ's RFC assessment; per § 404.1527(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(1)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2).[4] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques

---

[4] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. <u>Id</u>. § 404.1527(c)(2). Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id</u>.

As an initial matter, to the extent that Dr. Neville and Mr. Watkins[5] opined that Claimant was disabled as a result of his impairments resulting in him being absent from work more than four times a month and would be off task greater than 20% during a normal workday, the ALJ was under no duty to give any special significance to that opinion. See 20 C.F.R. § 404.1527(d)(1). Nevertheless, the ALJ noted that Dr. Neville and Mr. Watkins indicated that Claimant's pain was constantly severe enough to interfere with attention and concentration; that he could sit less than two hours, stand less than two hours, and walk less than two hours in an eight-hour workday; that he would have to take unscheduled breaks every hour during an eight-hour workday; that he could occasionally lift and carry up to 10 pounds; that he would have to frequently need to sit and elevate his knee above waist level during the workday; and that he had significant limitations in doing repetitive reaching, handling or fingering. (Tr. at 26, 686-690) The ALJ gave this opinion "little weight", explaining that the "severity of limitations are inconsistent with the objective findings consistently reflected in the treatment notes by Mr. Watkins." (Tr. at 26) The ALJ further explained

---

[5] Technically, because Claimant filed his claim prior to March 27, 2017, as a licensed Physician Assistant, Mr. Watkins was not an "acceptable medical source" pursuant to the Regulations. See 20 C.F.R. § 404.1502(a)(8). However, because the record demonstrates that Mr. Watkins has seen and treated Claimant more frequently than any other medical source, acceptable or not, it was appropriate for the ALJ to consider his opinion in tandem with Dr. Neville's. See generally, <u>Id</u>. § 404.1527(f).

that on June 2, 2016, Mr. Watkins advised Claimant that it was "okay" for him to lift; also, that during a pre-operative clearance on September 19, 2017, "prior to cholecystectomy and hernia repair, Mr. Watkins stated the claimant was doing well and had no complaints. (Tr. at 26, 748-815) In addition, the ALJ considered Claimant's most recent medications list did not reflect any prescribed pain medication. (Tr. at 26, 308-309)[6] Finally, the ALJ noted that "even the claimant's self-reported activities reflect higher functioning level than indicated on the form completed by Dr. Neville and Mr. Watkins." (Tr. at 26)

As noted *supra*, Claimant asserts that the ALJ erred because she failed to provide "good reasons" for rejecting his treating sources' opinion, and points out that the ALJ cited two treatment records that did not even concern Claimant's knee issues, resulting in a defective RFC assessment. (ECF No. 9 at 11) As an initial matter, it is clear that despite Dr. Neville's and Mr. Watkins' opinion that Claimant could only "occasionally lift and carry up to 10 pounds" and that Claimant had "significant limitations in doing repetitive reaching, handling or fingering", the ALJ noted that Mr. Watkins previously advised Claimant that he was "okay" to lift. This is, appropriately determined by the ALJ, inconsistent with the more extreme limitations provided in the November 28, 2017 questionnaire.

With regard to the remainder of Claimant's problems, including his knee issues, the ALJ specifically found that "the severity of limitations are [*sic*] inconsistent with the objective findings consistently reflected in the treatment notes by Mr. Watkins." (Tr. at 26) The ALJ did not simply refer to treatment records that had nothing to do with Claimant's knee pain to justify her devaluation of Dr. Neville's and Mr. Watkins' opinion. It is important to recognize that earlier in

---

[6] It is noted that this exhibit is dated January 25, 2018.

the written decision, the ALJ noted that Claimant testified that his main issue is knee pain. (Tr. at 23) As to Claimant's knee problems, the ALJ discussed Claimant's testimony indicating that he sits home with an ice pack on his knee most of the day; that he sometimes washes clothes, cooks in the microwave, and does a little yard work; that he went on vacation in Cancun but stayed in his hotel room; that after an evaluation at Cleveland Clinic, there was nothing that could be done because of Claimant's osteoarthritis; and that Claimant had fallen in the past because his knee gives out. (Id.) Though the ALJ recognized that his knee pain was the primary problem, and acknowledged that the evidence of record corroborated same, the ALJ noted that the objective findings as well as Claimant's self-reported activities of daily living were inconsistent with the severity of the limitations alleged. (Id.) This included a review of the ultrasound taken of Claimant's right knee at the Cleveland Clinic on August 25, 2014 that showed "proximal and mid patellar tendon thickening and mixed echogenicity possibly related to postoperative changes or tendinosis, but no distinct tendon tear"; that Claimant had a normal gait during the physical examination at that time; and that Dr. Farrow advised that the MRI showed severe patellofemoral osteoarthritis, but an intact tendon, and that Dr. Farrow did not recommend "concomitant patellar tendon reconstruction at the time of patellofemoral arthroplasty", however, if Claimant decided on surgery, then "it should be allograft given his age." (Tr. at 23, 344-345, 346-366)

Next, noting that Claimant alleged disability beginning on September 25, 2014, the ALJ recognized that Claimant was on short-term disability from September 29, 2014 through February 5, 2015 (Tr. at 23, 195-196), and the records do not indicate what specific limitations related to the short-term disability. (Tr. at 23, 181-194) Significantly, the ALJ found that Claimant returned

to his past relevant work at SGA levels from February 6, 2015 until August 18, 2015[7], "*when he injured his shoulder* . . . the claimant achieved good results with right shoulder surgery in a short period, which he acknowledged during testimony." (Tr. at 23) (*italics* supplied) Obviously, the ALJ explicitly noted that Claimant quit working due to a shoulder injury, not because of his knee issues.

The ALJ proceeded to discuss Dr. Beard's findings during the consultative examination on December 8, 2015, including Dr. Beard's observation that Claimant limped on the right with some varus alignment of the right knee, but needed no handheld assistive device, and that Claimant's gait was not unsteady or unpredictable and that he could stand unassisted. (Tr. at 24, 452-458) Additionally, the ALJ acknowledged that Dr. Beard found that Claimant's right knee had moderate pain and crepitus, although the left knee was normal, and that Claimant could heel walk, toe walk, and tandem walk. (Id.) Next, the ALJ considered Mr. Watkins' notes from February 27, 2017 that Claimant was participating in physical therapy for his right knee and that he prescribed a rigid stability right knee brace. (Tr. at 24, 675) Further, the ALJ noted that an x-ray taken of Claimant's right knee on July 18, 2017 was unchanged from x-rays taken in August 2012. (Tr. at 24, 691-747) Additionally, the ALJ noted that "[a]s recently as August 28, 2017, the claimant reported to Mr. Watkins that his knee pain was worse with activities such as mowing and requested increase in medication. However, Mr. Watkins noted the claimant would continue current medications." (Tr. at 24, 748-815)

---

[7] It is also significant that the ALJ acknowledged the vocational expert's testimony that Claimant's past relevant work as a machine inspector was classified as light exertion, but as performed by Claimant, at the medium and heavy exertional level. (Tr. at 27)

Though unrelated to his right knee impairment, it is important to mention the ALJ's discussion of the evidence concerning Claimant's back pain, particularly in light of Claimant's contention that light exertional work involves "a good deal of walking or standing" and therefore contrary to the evidence or record. (ECF No. 9 at 12, *quoting* 20 C.F.R. § 404.1567) To that extent, the ALJ noted that Claimant reported to Mr. Watkins on March 9, 2015 that his back pain started suddenly two weeks previously, but denied it radiated and it was noted that Claimant had a normal gait. (Tr. at 25, 524-526)[8] The ALJ further noted that during an office visit on February 13, 2017, Claimant reported to Mr. Watkins that his lumbar pain started two weeks ago, and Mr. Watkins indicated Claimant had lumbago and instructed him to avoid heavy lifting and to use a firm mattress, also, Mr. Watkins encouraged Claimant "to exercise regularly." (Tr. at 25, 666-685, 748-815)

After having considered this evidence related to Claimant's right knee osteoarthritis, lumbago and other impairments, the ALJ determined that Claimant was restricted to no more than light exertion with the postural and reaching limitations outlined in the RFC. (Tr. at 25) The ALJ noted that Claimant "consistently demonstrated normal gait and required no assistive device for ambulation"[9], that Claimant endorsed improvement in his back pain while forgoing x-rays as recommended, and that other than the hernia repair, "the claimant's conditions were conservatively treated with medication and no reported side effects." (Id.) Indeed, the ALJ was permitted to discount Claimant's treating source opinion where the record showed that he received conservative

---

[8] Although the ALJ cited to page 67 of Exhibit 10F, those specific notations span three pages of treatment notes from that day.

[9] While the finding that Claimant "consistently" demonstrated normal gait is inaccurate given the evidence of record cited by the ALJ (i.e. Dr. Beard's consultative examination findings), the finding that he did not require an assistive device for ambulation is accurate.

treatment with respect to his knee condition. See Hall v. Berryhill, 2017 WL 4330356, at *6 (E.D.N.C. Sept. 29, 2017); see also, Tilley v. Colvin, 2016 WL 775420, at *12 (D. Md. Feb. 29, 2016) (" '[i]t is entirely appropriate for an ALJ to consider a discrepancy between a treating physician's opinion and the provision of conservative treatment to address a condition.' ") (*quoting* Norris v. Comm'r, Soc. Sec., 2014 WL 2612367, at *4 (D. Md. June 9, 2014).

The ALJ also considered Claimant's activities of daily living, which also indicated a higher level of physical functioning than alleged: on August 24, 2015, Claimant complained to his primary care provider that he had not been able to go to the gym in the last two weeks because he fell in Cancun and injured his shoulder. (Tr. at 26, 533) The ALJ mentioned that Claimant's responses in a function questionnaire reported that he took care of his dog, that he could drive, goes out alone, did laundry and simple cleaning, and that he mowed the grass, although he took breaks. (Tr. at 26, 227-234, 258-266)[10]

Finally, it is further significant that the ALJ considered the opinions provided by the State agency physicians, who both opined that Claimant was capable of medium exertion level work, and that the ALJ only gave these opinions "partial weight", highlighting that the evidence supported findings that Claimant had postural restrictions and his ability to frequently lift 25 pounds overhead. (Tr. at 27, 70-80, 82-94) The ALJ explained that the objective evidence regarding Claimant's hernia, right knee, lumbago, and locked finger were more consistent with restricting Claimant to light work. (Id.)

In sum, the ALJ did not simply rely upon two treatment notes to discount the treating source opinion evidence, but as required by the Regulations, considered all the relevant evidence of record

---

[10] It is noted that the ALJ refers to Claimant's Function Reports, dated October 26, 2015 and February 22, 2016.

and found that Claimant was not as limited as suggested by Dr. Neville and Mr. Watkins. In short, the ALJ provided "good reasons" for giving "little weight" to their opinion in accordance with Section 404.1527(c)(2). Accordingly, the undersigned **FINDS** that the ALJ's evaluation and explanation for the weight afforded to Claimant's treating medical source is supported by the substantial evidence.

The RFC Assessment:

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted). The Fourth Circuit and this Court have recognized that the RFC assessment is an administrative finding rather than a medical finding. See Felton–Miller v. Astrue, 459 F.App'x. 226, 230–231 (4th Cir. 2011) (stating that RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record.") (citing 20 C.F.R. § 404.1546(c)); Youkers v. Colvin, No. 3:12–9651, 2014 WL 906484, at *10 (S.D.W.Va. Mar. 7, 2014). Thus, an ALJ is not required to obtain an

expert medical opinion as to a claimant's RFC. Felton–Miller, 459 F.App'x at 230–31; Hucks v. Colvin, No. 2:12–cv–76, 2013 WL 1810658, at *9 (N.D.W.Va. Apr. 3, 2013), report and recommendation adopted by 2013 WL 1810656 (N.D.W.Va. Apr. 29, 2013).

Claimant has argued that his treating source opinions were consistent with the record documenting Claimant's right knee crepitus, painful range of motion, limited stability, and that providers at the Cleveland Clinic found the right knee too arthritic to the extent that it precluded successful rehabilitation after surgery, and that this ultimately conflicts with the ALJ's RFC assessment. (ECF No. 9 at 11, 14-15) However, as provided by the Regulations and this Circuit's jurisprudence, *supra*, the RFC assessment is solely determined by the ALJ, and the ALJ was under no duty to abide by any specific medical opinion of record, but only to "consider" them. See 20 C.F.R. § 404.1545(a)(3) ("We will consider any statements about what you can still do that have been provided by medical sources[.]"). Although Claimant has alleged that his right knee impairment was too severe that precluded light exertional level work, the ALJ noted conflicts between the treating source opinion and the medical and other evidence of record to arrive at her RFC determination. As stated *supra*, such conflicts are for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Because the ALJ appropriately evaluated the opinion evidence and provided sufficient explanation for her reconciliation of the conflicting evidence of record, the undersigned **FINDS** the ALJ's RFC assessment is supported by substantial evidence.

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled prior to December 11, 2017 is supported by substantial evidence.[11]

---

[11] Claimant briefly mentioned that justification for the ALJ's partial award is explained by her finding that Claimant remained capable of light work because pursuant to the Medical-Vocational Guidelines, he would have been eligible for disability when he turned 55 years of age. (ECF No. 9 at 12, n. 1) However, as pointed out by the Commissioner (ECF No. 10 at 11), the ALJ actually found that Claimant was disabled prior to his 55th birthday by three months.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for Judgment on the Pleadings (ECF No. 9), **GRANT** the Defendant's request to affirm the decision (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: September 25, 2019.

Omar J. Aboulhosn
United States Magistrate Judge